IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| HENRY MCMASTER, in his official capacity as Governor of the State of South Carolina, and SOUTH CAROLINA DEPARTMENT OF LABOR, LICENSING & REGULATION,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, in her official capacity as Acting Secretary of Labor; OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION; and DOUGLAS PARKER, in his official capacity as Assistant Secretary for Occupational Safety and Health,<br><br>*Defendants.* | Civil Action No.: 3:23-cv-1038-SAL<br><br><br>**Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss** |

Plaintiffs respectfully submit this Response in Opposition to Defendants' Motion to Dismiss (ECF No. 12).

## **INTRODUCTION**

When Congress enacted the Occupational Safety and Health Act of 1970, Pub. L. 91-596, 84 Stat. 1590 (Dec. 29, 1970) ("OSH Act") to promote safe and healthy workplaces, Congress gave States the option to create their own plan for achieving these goals. South Carolina did just that, and the State has run its State Plan successfully for half a century.

Then, in a 2016 Interim Final Rule that was supposed to simply increase federal civil penalties, Defendants declared that state plans *must* increase their civil penalties to match the federal ones. *See* Department of Labor Federal Civil Penalties Inflation Adjustment Act Catch-Up Adjustments, 81 Fed. Reg. 43,430, 43,436–37 (July 1, 2016) ("2016 Interim Final Rule"). For years after that, however, Defendants took no steps to enforce this mandate; all they did was note

that the issue existed. Yet within the past year, that changed, and Defendants suddenly put teeth into this mandate, by making the civil-penalty issue a finding in the latest FAME Report for South Carolina's State Plan and by attempting to revoke Arizona's state plan. Defendants' actions compelled Plaintiffs to bring this lawsuit to prevent Defendants from penalizing the State and revoking the State Plan for refusing to comply with an unlawful decree.

Rather than address the merits of Plaintiffs' claims, Defendants offer up various jurisdictional and procedural arguments, none of which has merit. The claims here are timely, as the six-year limitations period on which Defendants rely was tolled, either by the previous lawsuit that Plaintiffs filed or by Defendants' own delay in trying to enforce their mandate. Plaintiffs' claims are, moreover, within this Court's jurisdiction. *Thunder Basin* does not apply in a situation like this, in which the only way a party can obtain judicial review is "to bet the farm," "incur a sanction," and face "severe punishment should its challenge fail." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010). Defendants' other arguments are similarly flawed, so their Motion to Dismiss should be denied.

## BACKGROUND

### A.     OSHA and state plans

The OSH Act took effect in 1971, *see* § 34, 84 Stat. at 1620, and it required the Secretary of Labor to promulgate standards for safety and health in workplaces based on national-consensus or established-federal standards, *see* 29 U.S.C. § 655(a); *see also id.* § 652 (defining terms). To implement this congressional directive, the Secretary created OSHA, and to promote compliance with the promulgated standards, the OSH Act established federal civil (as well as criminal) penalties for violations. *See id.* § 666.

As an alternative to having employers in a State governed directly by OSHA and these

federal regulations, Congress gave States the option to create state plans. *See id.* § 667(b). The Secretary must approve a state plan if it meets certain criteria, including (importantly for this case) providing "for the development and enforcement of safety and health standards relating to one or more safety or health issues, which standards (and *the enforcement of which standards*) are or will be *at least as effective* in providing safe and healthful employment and places of employment as the standards promulgated" by OSHA. *Id.* § 667(c)(2) (emphasis added); *see also* 29 C.F.R. § 29.1902.1 *et seq.* (providing criteria and procedure for approval of state plans). If the Secretary finds that, after approval, the administration of a state plan fails "to comply substantially with any provision" of that plan, then the Secretary may withdraw his approval of the plan. 29 U.S.C. § 667(f).

The Secretary gave South Carolina initial approval to operate the State Plan in 1972, *see* South Carolina Developmental Plan, 37 Fed. Reg. 25,932 (Dec. 6, 1972), before certifying the State Plan four years later, *see* South Carolina; Certification of Completion of Developmental Steps, 41 Fed. Reg. 32,424 (Aug. 3, 1976). South Carolina received final approval of the State Plan in 1987. *See* South Carolina State Plan; Final Approval Determination, 52 Fed. Reg. 48,103 (Dec. 18, 1987). South Carolina has successfully administered and effectively enforced the State Plan for more than five decades. Compl. ¶ 39, ECF No. 1.

### B. Federal civil penalties for violations of workplace safety and health standards

The OSH Act established the original maximum amounts of federal civil penalties for violations. *See* OSH Act, § 17, 84 Stat. at 1606–07. For example, willful or repeated violations of federal standards could result in a fine of up to $10,000 per violation. *Id.* § 17(a), 84 Stat. at 1606. Serious violations subjected parties to penalties of up to $1,000 per violation. *Id.* § 17(b), 84 Stat. at 1606. Failing to comply with OSHA's requirement to post certain information for employees

about workplace safety and health also carried a penalty of up to $1,000. *Id.* § 17(i), 84 Stat. at 1607.

Two decades later, Congress amended the federal penalty amounts in the Omnibus Reconciliation Act of 1990, Pub. L. 101-508, 104 Stat. 1388 (Jan. 23, 1990). Congress changed the $10,000 cap on federal penalties for willful or repeated violations to $70,000 and the cap on other penalties (such as for serious violations and failure to post information) to $7,000. *See id.* Title III, § 3101, 104 Stat. at 1388-29. These federal penalty provisions remain codified in the United States Code today. *See* 29 U.S.C. § 666.

Shortly thereafter, to account for inflation, Congress enacted the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990) ("1990 Federal Penalties Act"). The 1990 Federal Penalties Act required most federal agencies to adjust their civil penalties every five years to account for any intervening inflation, *see id.* § 4, 104 Stat. at 891, but OSHA was one of a few agencies that Congress later exempted from this requirement, *see* Debt Collection Improvement Act of 1996, § 31001(s)(1), Pub. L. 104-134, 110 Stat. 1321-358, 1321-373 (Apr. 26, 1996).

OSHA lost this exemption in the Bipartisan Budget Act of 2015, which included the Federal Civil Penalties Inflation Adjustment Act of 2015, Pub. L. 114-74, Title VII, 129 Stat. 584, 599 (Nov. 2, 2015) ("2015 Federal Penalties Act"). The 2015 Federal Penalties Act shortened the timeline for inflation adjustments from five years to one. *Id.* § 701(b)(1)(A), 129 Stat. at 599 (amending 28 U.S.C. § 2461 note). It also required agencies to make a one-time adjustment to the federal civil penalties "through an interim final rulemaking" process.[1] *Id.* § 701(b)(1)(D), 129 Stat.

---

[1] Unlike most rules, which are proposed, commented upon, revised, and only then published by a federal agency as a final rule, an interim final rule becomes effective immediately upon publication, without any prior comment period. Interim final rules are typically issued under

at 599 (amending 28 U.S.C. § 2461 note). After that, the 2015 Federal Penalties Act requires OSHA to make annual adjustments to these federal penalties for inflation, and it exempts these adjustments from § 553's notice-and-comment requirements. *Id.* § 701(b)(1)(D), 129 Stat. at 599 (amending 28 U.S.C. § 2461 note).

Consistent with the 2015 Federal Penalties Act, OSHA issued inflation adjustments for federal civil penalties for every year since 2016. *See* Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2023, 88 Fed. Reg. 2210 (Jan. 13, 2023) ("2023 Adjustment"); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2022, 87 Fed. Reg. 2328 (Jan. 14, 2022); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2021, 86 Fed. Reg. 2964 (Jan. 14, 2021); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2020, 85 Fed. Reg. 2292 (Jan. 15, 2020); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2019, 84 Fed. Reg. 213 (Jan. 23, 2019); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2018, 83 Fed. Reg. 7 (Jan. 2, 2018); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2017, 82 Fed. Reg. 5373 (Jan. 18, 2017) ("2017 Adjustment"); 2016 Interim Final Rule, 81 Fed. Reg. 43,430.

### C.    State civil penalties for violations of workplace safety and health standards

Since the Secretary of Labor approved the State Plan, South Carolina law has included civil (and criminal) penalties for violations of state health and safety standards. Initially, the maximum civil penalties were $1,000 and $500. *See* 1971 S.C. Acts No. 379, § 13 (codified at S.C. Code

---

one of § 553(b)'s exceptions for publishing proposed rules, *see* 5 U.S.C. § 553(b), or (as in this case) pursuant to a specific congressional directive.

§ 40-273 (1962)). The South Carolina General Assembly increased those statutory caps to $10,000 and $1,000, depending on the type of violation. *See* 1973 S.C. Acts No. 311, § 1. The General Assembly again increased South Carolina's caps on statutory civil penalties to $70,000 and $7,000 following the congressional increase of federal penalties in 1990. *See* 1991 S.C. Acts No. 25 (codified at S.C. Code Ann. § 41-15-320).

South Carolina's penalties have remained unchanged since 1991 and remain at the levels in the OSH Act. *See* 29 U.S.C. § 666.

### D.    Defendants demand increases to state civil penalties

In the 2016 Interim Final Rule, OSHA stated that state plans must "increase their penalties to reflect the federal penalty increases at the state levels in order to maintain this 'at least as effective' status." 81 Fed. Reg. at 43,446. OSHA further declared that "State Plans will also be required to increase their penalties regularly in the future to maintain at least as effective penalty levels." *Id.* at 43,447. The 2016 Interim Final Rule included no discussion of how the text of the OSH Act even permits matching penalties, and the only rationale Defendants offered in the 2016 Interim Final Rule for requiring increased penalties was a "deterrence principle[]" that "rational actors are *less likely* to commit violations when faced with higher penalties." *Id.* at 43,445. In this Interim Final Rule, Defendants also amended § 1902.4(c)(2)(xi) so that it requires state plans to have "effective sanctions against employers who violate State standards and orders, such as those set forth in the Act, and in 29 CFR 1903.15(d)." 29 C.F.R. § 1902.4(c)(2)(xi).

OSHA offered some additional commentary on its position in the 2017 Adjustment. As for penalties having to match, the 2017 Adjustment insisted that "OSHA's long-standing position" is "that 'at least as effective,' in this context, means that State Plans must have maximum and minimum penalty levels that are at least as high as OSHA's maximum and minimum penalty

levels." 2017 Adjustment, 82 Fed. Reg. at 5375; *see also id.* at 5376 ("historically, State Plans have matched OHSA's maximum and minimum penalties identically"). As for the insertion of 29 C.F.R. § 1903.15(d) into § 1902.4(c)(2)(xi), the 2017 Adjustment characterized this change as merely a "technical amendment" or "pointer" that OSHA had "the inherent authority" to make. *Id.* at 5376.

In the subsequent annual adjustments, OSHA invoked 29 U.S.C. § 667(c)(2), 29 C.F.R. § 1902.4(c)(2)(xi), and 29 C.F.R. § 1902.37(b)(12) as the bases for requiring state plans to make annual adjustments to their civil penalties. *See, e.g.*, 2023 Adjustment, 88 Fed. Reg. at 2213.

At no point during the five-plus years since the 2016 Interim Final Rule became effective did Defendants take any steps to enforce this mandate on the State Plan. Only after the current Administration took office in 2021 did that change, when OSHA issued its FY 2021 Federal Annual Monitoring Evaluation Report for South Carolina ("2021 FAME Report"), which asserts that state plans "were required to adopt the initial maximum penalty level increase and the subsequent annual increases." 2021 FAME Report, at 18 (attached as Exhibit 1). The 2021 FAME Report includes a finding that the "State Plan has failed to adopt OSHA's initial FY 2016 maximum and minimum penalty increase and subsequent annual penalty amount increases." *Id.*

Findings in a FAME Report are significant because they are "limited to those issues that warrant corrective action by the State Plan to ensure it is [at least as effective]" as the federal standards. OSHA, *State Plan Policies and Procedures Manual* 74 (May 6, 2020), https://tinyurl.com/2p93wtfv. A finding is the first step OSHA takes if it intends to revoke a state plan's final approval. *See* 29 C.F.R. § 1902.47 *et seq.*; *see also, e.g.*, Arizona State Plan for Occupational Health and Safety; Proposed Reconsideration and Revocation, 87 Fed. Reg. 23,783 (Apr. 21, 2022). Revoking final approval would lead to concurrent jurisdiction between the State

and OSHA such that OSHA could take over direct enforcement of workplace health and safety standards, displace LLR, and inject uncertainty and confusion into South Carolina's longstanding regulatory scheme, which has successfully resulted in safe and healthy workplaces in South Carolina for decades.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) should be granted only when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim, "a plaintiff must plead enough factual allegations 'to state a claim to relief that is plausible on its face.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A court must accept "well-pleaded allegations" "as true and draw all reasonable factual inferences from those facts in the plaintiff's favor." *Harrell v. Freedom Mortg. Corp.*, 976 F.3d 434, 439 n.5 (4th Cir. 2020) (internal alteration omitted). "Generally speaking, 'a motion to dismiss is rarely appropriate in a declaratory judgment action.'" *New York Life Ins. Co. v. Scott*, No. CV 2:21-01898-RMG, 2021 WL 4086483, at *2 (D.S.C. Sept. 7, 2021) (additional internal quotation marks omitted) (quoting *Brown-Thomas v. Hynie*, 412 F. Supp.3d 600, 606 (D.S.C. 2019)).

## ARGUMENT

### I.     Plaintiffs' claims are timely.

Defendants insist Plaintiffs' claims related to the 2016 Interim Final Rule are untimely under 28 U.S.C. § 2401(a)'s six-year statute of limitations. *See* ECF No. 12, at 14–18.[2] What Defendants overlook is the fact that § 2401(a)'s time limit is a claim-processing rule subject to equitable tolling, *see, e.g.*, *DeSuze v. Ammon*, 990 F.3d 264, 272 (2d Cir. 2021); *Jackson v. Modly*,

---

[2] Page cites are to the ECF-generated page numbers at the top of the page.

949 F.3d 763, 778 (D.C. Cir. 2020); *Clymore v. United States*, 217 F.3d 370, 374 (5th Cir. 2000),[3] and that there are two reasons to toll it here.

*First*, equitable tolling is permitted when a plaintiff "has actively pursued his judicial remedies by filing a defective pleading during the statutory period." *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990). Defendants insist that *McMaster I* did not toll the limitations period because Plaintiffs challenged the 2022 Adjustment, rather than the 2016 Interim Final Rule. *See* ECF No. 12, at 16–17. This argument, however, ignores the fact that Plaintiffs explicitly and repeatedly said they were challenging the "mandate" in that Adjustment, not the mathematical calculation of the increase in the penalties. Dec. 2, 2023 Hr'g Tr., *McMaster I*, at 13; *see also, e.g.*, *id.* at 4 ("This case is, at its core, a challenge to how the federal government has gone about trying to force state OSHA plans to raise their civil penalties."); *id.* at 5 (argument focusing on the "mandate" language of the 2022 Adjustment); *id.* at 6–7 (discussing the 2016 Interim Final Rule); *id.* at 19–21 (discussing the meaning of "at least as effective as"); *id.* at 66 (arguing the effect of "the underlying statute and regulation"). In fact, Plaintiffs even stated that challenging Defendants' interpretation of the OSH Act was "the alternative" if Plaintiffs couldn't challenge the 2022 Adjustment and that Plaintiffs were "happy to challenge" the 2016 Interim Final Rule if that was "where [the Court] conclude[s]" Plaintiffs' claims needed to lie. *Id.* at 13–14; *see also id.* at 71 (offering to challenge any and all regulations and statutes to assert these claims). If these arguments at the hearing weren't enough, the opening paragraph of the complaint there said Plaintiffs brought that "action to challenge the requirement that the South Carolina State Plan increase its civil penalties to match the increased federal civil penalties," *McMaster I*, ECF No. 1, at 1, and the

---

[3] The Fourth Circuit has not yet ruled on this question, but the overwhelming weight of authority supports the conclusion that this limitations period can be equitably tolled.

briefing in that case drove home that Plaintiffs' focus was the purported obligation that the State

Plan increase its civil penalties to match the federal ones, *see, e.g.*, *McMaster I*, ECF No. 8, at 15–

18; *McMaster I*, ECF No.22, at 8–13. As it turned out, this Court concluded that the 2022

Adjustment was not actually the mandate on the State Plan.

This case represents a textbook example of equitable tolling. They "pursued [their] judicial

remedies" before the limitations period ran, by Defendants' own calculation, on January 18, 2023.

*Irwin*, 498 U.S. at 96; *see* ECF No. 12, at 4, 15. In no way had Plaintiffs "failed to exercise due

diligence." *Id.* Instead, Plaintiffs simply challenged the wrong promulgation from Defendants,

mistakenly (it turned out) assigning too much weight to Defendant's declaration that the 2022

Adjustment was a "final rule," 87 Fed. at Reg. 2328, that could thus be challenged in court. A mere

12 days after this Court held that it lacked jurisdiction to rule on Plaintiffs' challenge to the 2022

Adjustment, Plaintiffs filed their Complaint here.[4] With the benefit of tolling from August 8, 2022,

when *McMaster I* was filed, to March 2, 2023, when *McMaster I* was dismissed, Plaintiffs' claims

here are timely.

*Second*, equitable tolling is allowed when "the complainant has been induced or tricked by

his adversary's misconduct into allowing the filing deadline to pass." *Irwin*, 498 U.S. at 96; *see*

*also Weick v. O'Keefe*, 26 F.3d 467, 470 (4th Cir. 1994) (equitable tolling permitted when a

plaintiff is "lulled . . . into inaction" by the defendant's misconduct). Defendants are quick to point

out that several States commented on the 2016 Interim Final Rule being arbitrary and capricious

---

[4] Ultimately, Plaintiffs' goal is to ensure the Court can fulfill the Fourth Circuit's "strong preference that . . . claims and defenses be disposed of on their merits." *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010). To that end, as an alternative to this new lawsuit, Plaintiffs are filing a Rule 60(b) motion to reopen *McMaster I* for leave to amend the complaint and assert their claims there, with a few differences that are described in that motion.

and that OSHA raised the State Plan's civil penalties as "new issues" in FAME Reports from 2016 through 2020. *See* ECF No. 12, at 11, 16. To be sure, those things are true, but Defendants took no action after responding to the comments, and "issues" are not "findings."

But what Defendants omit is that they did *nothing* to even suggest they were going to actually enforce this mandate on any state plan until the 2021 FAME Report. Years of inaction led Plaintiffs (and seemingly everyone) to believe that Defendants were not actually going to enforce the mandate in the 2016 Interim Final Rule and their interpretation of the OSH Act and their regulations.

Only in the months and days before *McMaster I* did Defendants change course. Defendants made the civil penalties a finding a FAME Report for the first time in Fiscal Year 2021, which was related on August 4, 2022 (just four days before Plaintiffs filed *McMaster I*). *See* Farr Decl. ¶ 13, *McMaster I*, ECF No. 8-1, at 4. Even outside of South Carolina, Defendants only began to take action on state civil penalties earlier in 2022, when OSHA sought to begin revoking Arizona's state plan for, among other things, not increasing its civil penalties. *See* Arizona State Plan for Occupational Health and Safety; Proposed Reconsideration and Revocation, 87 Fed. Reg. 23,783, 23,786 (Apr. 21, 2022). In other words, within four months after any indication and four days after an indication in South Carolina that Defendants were going to try, for the first time, to enforce their unlawful demand that state civil penalties match federal ones—that is, when there was no more "lulling" Plaintiffs into believing there was no need to take action—Plaintiffs challenged Defendants' authority to impose such a requirement.

Consider what not equitably tolling the limitations period here would do. Without tolling, any state entity or official (or, for that matter, any private plaintiff) would feel the need to rush to the courthouse every time the federal government promulgated a new rule that might be—if only

years later—interpreted or applied in a way with which the potential plaintiff disagrees. Tolling the limitations period allows the facts to develop, which either crystalizes the dispute or makes litigation unnecessary. On the other hand, not tolling the limitations period disincentives federal-state cooperation, incentives shotgun legal challenges rather than rifle-shot approaches, and invites ripeness defenses to quickly brought claims.

## II.    Plaintiffs' claims are within this Court's jurisdiction.

### A.    *Thunder Basin* does not apply here.

Defendants insist that because South Carolina has a "judicial backstop" in place, Plaintiffs' claims for declaratory relief fall outside of this Court's jurisdiction under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). ECF No. 12, at 18. Defendants, however, miss the fact that this so-called backstop demands exactly what the Supreme Court "normally do[es] not require" of a plaintiff: "to bet the farm by taking the violative action before testing the validity of the law." *Free Enter. Fund*, 561 U.S. at 490 (cleaned up). Under Defendants' view here, only by jeopardizing the State Plan can South Carolina challenge Defendants' interpretation of the OSH Act and the regulations.

The *Thunder Basin* doctrine recognizes that Congress may implicitly deprive district courts of jurisdiction over certain types of claims. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 900 (2023). The first step in determining whether Congress has done so is to ask whether it is "fairly discernible in the statutory scheme" that Congress intended to "allocate[] initial review to an administrative body." *Thunder Basin*, 510 U.S. at 207. Defendants admit that no court has ever held that 29 U.S.C. § 667(g) divests district courts of jurisdiction, *see* ECF No. 12, at 20 n.16, so they are asking this Court to break ground in installing a new lock on the courthouse door. Although Congress may have explicitly discussed district court jurisdiction in other contexts of

the OSH Act, Congress did not exclude all claims about state plans from a district court's jurisdiction in § 667(g). That section is narrow and applies only when the Secretary "withdraw[s] approval or reject[s]" a state plan, at which point a State may seek review from the circuit court. 29 U.S.C. § 667(g); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240–41 (1989) ("as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute").

Comparing the OSH Act to other statutes confirms that § 667(g) does not reveal or express any congressional intent to allocate all claims to an administrative body. Take, for instance, the Mine Act in *Thunder Basin*. There, the Supreme Court pointed to 30 U.S.C. § 815 ("procedure for enforcement"), § 823(d) ("proceedings before administrative law judge; administrative review"), and § 830(i) ("authority [of commission] to assess civil penalties"). 510 U.S. at 207–08. The Mine Act had a "detailed structure" for agency review. *Id.* at 207. Likewise, in *Elgin v. Department of Treasury*, the Court pointed to 5 U.S.C. § 7511 ("definitions"), § 7512 ("actions covered"), § 7513 ("cause and procedure"), § 7701 ("appellate procedures"), and § 7703 ("judicial review of decisions of the Merit Systems Protection Board") to describe the "elaborate framework" that Congress established for the claims at issue there. 567 U.S. 1, 11 (2012) (internal quotation mark omitted).

Here, by contrast, Defendants can point to only two short, adjacent subsections. *See* ECF No. 12, at 19 (citing 29 U.S.C. §§ 667(f), (g)). But notably, those provisions are limited to the Secretary's authority to review and withdraw approval of state plans. They provide a framework for nothing else to be resolved in this administrative process.

Even if Defendants could demonstrate that § 667(f) and § 667(g) are part of a statutory scheme to take claims away from district courts, Defendants have not (and cannot) establish that

claims like the ones here are ones that Congress intended to be within this statutory structure. *See Axon Enter.*, 143 S. Ct. at 900. This second step of *Thunder Basin* involves a three-part inquiry: One, "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim?" *Id.* (cleaned up). Two, "is the claim wholly collateral to the statute's review provisions?" *Id.* (cleaned up). And three, "is the claim outside the agency's expertise?" *Id.* (cleaned up).

*First*, the fact that review before a court of appeals "can" provide meaningful review is clear. *Id.* at 903. This factor requires examining the particular claim that the plaintiff brings to determine if meaningful review can happen in the court of appeals for that claim. *See id.* at 903–04. Here, Plaintiffs aren't claiming, for instance, that Defendants would be forcing the State Plan to adopt health or safety standards that are unnecessary or duplicative. Plaintiffs aren't claiming that Defendants are misinterpreting data about the effects of the State Plan on workers. Rather, Plaintiffs are claiming that Defendants are suddenly trying to force the State Plan to do something that federal law does not authorize Defendants to force the State Plan to do.

This distinction between types of claims is clear from the text of § 667(g). That provision permits a court of appeals to modify or set aside the Secretary's decision only if the decision "is not supported by substantial evidence." 29 U.S.C. § 667(g). "Substantial evidence" is, as its name suggests, an evidentiary-related framework that "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (case involving 42 U.S.C. § 405(g) and the standard for judicial review of findings by the Social Security commissioner). Questions of law involving the scope of agency authority— like the ones Plaintiffs raise here—have nothing to do with factual findings or whether there is substantial evidence in any record.

Clarifying the nature of Plaintiffs' claim also disposes of Defendants' suggestion that

§ 667(f) and § 667(g), when read together, preclude judicial review here. *See* ECF No. 12, at 21. This isn't some attempt to demand pre-enforcement review of a decision that rightly belongs to the Secretary under § 667(f) and for which a state plan is afforded meaningful review under § 667(g). (Additionally, Defendants' argument here undercuts their suggestion that Plaintiffs have already "bet the farm" because the State Plan has not, as of today, ceased to be in effect. *See infra* p. 16.)

Defendants' eagerness to try to muster a defense to the "bet the farm" disclaimer from *Free Enterprise* overlooks a basic fact: Plaintiffs do not want to lose the State Plan. The State Plan has worked well for half a century. Moreover, Plaintiffs do not want to *have* to litigate the claims they assert here. Yet bringing this case is the only way that Plaintiffs can get any resolution to their dispute with Defendants regarding whether the OSH Act permits and the regulations require state civil penalties to match (or exceed) federal ones without risking the State Plan.

That said, Defendants still miss the mark on their "bet the farm" argument, and *Free Enterprise* confirms as much. *See* ECF No. 12, at 21–24. The harm that petitioners in that case faced was a sanction from the Public Company Accounting Oversight Board, which could have followed a critical report and formal investigation that the Board had issued and launched. 561 U.S. at 486–87. The federal government argued that the petitioners could raise their claim "by appealing a Board sanction." *Id.* at 490. That, of course, the Court explained, would have required petitioners to "incur a sanction," then, if the Securities and Exchange Commission affirmed, petitioners would have "w[o]n access to a court of appeals—and severe punishment should its challenge fail." *Id.* (emphasis omitted). This scenario was the "bet the farm" risk that the Court "d[id] not require" from plaintiffs and did "not consider . . . a 'meaningful' avenue of relief." *Id.* at 490–91.

Plaintiffs face that precise scenario here, under Defendants' reading of the OSH Act. According to Defendants, Plaintiffs must refuse to capitulate to Defendants' demand to increase the state civil penalties, let the Secretary withdraw approval of the State Plan (thereby incurring the sanction), and only then seek judicial review in the Fourth Circuit, at which point Plaintiffs risk the severe punishment of losing the State Plan if their challenge fails. Whatever the origins of "bet the farm" and no matter the other contexts in which that phrase has been applied, it applies here with full force.

That an appellate court could "set aside' the Secretary's withdrawal of approval does not change the fact that there is immediate harm. 29 U.S.C. § 667(g); *see* ECF No. 12, at 22. The State Plan has been the sole source of health and safety regulations in South Carolina since it received final approval 35 years ago. Revoking final approval would inject uncertainty and potentially chaos into the state regulatory scheme, upend LLR's processes (not to mention the confusion on regulated businesses), and potentially displace state employees. Granted, such uncertainty could come in a proceeding that undoubtedly falls under § 667(f) and § 667(g), but Congress has made that choice, and that's a choice Congress gets to make. South Carolina, however, does not wish to—and is not required to—play high-stakes poker with the State Plan.

Defendants are incorrect that the State Plan has already bet the farm. *See* ECF No. 12, at 23–24. To be sure, the General Assembly has not increased the statutory civil penalties yet, but for years, Defendants did nothing about that. Only now, in the 2021 FAME Report have Defendants taken the first step to bring this issue to a head by making the civil penalties a "finding" in that report. Again, findings are "limited to those issues that warrant corrective action by the State Plan to ensure it is [at least as effective]" as the federal standards, OSHA, *State Plan Policies and Procedures Manual* 74, and they are the first step OSHA takes if it intends to revoke a state plan's

16

final approval. Only now does the State Plan actually face the choice of whether to increase civil penalties and resolve the finding or to stand firm in Plaintiffs' position that such a demand of the State Plan is unlawful and await revocation proceedings.

There is also a practical reality here. Defendants do not contend that Counts Four and Six (the APA-based challenges to the 2016 Interim Final Rule) fall within *Thunder Basin*. But to resolve those questions, the Court has to consider the question of whether Defendants have the authority under the OSH Act to demand state plans have civil penalties that match federal ones and whether federal regulations already require as much because, in the 2016 Interim Final Rule, Defendants essentially assumed as much. They never explained why 29 U.S.C. § 667(c)(2), 29 C.F.R. § 1902.4(c)(2)(xi), or 29 C.F.R. § 1902.37(b)(12) might permit Defendants to mandate that state penalties be identical to (or exceed) federal ones. To determine what Defendants needed to address in the 2016 Interim Final Rule to satisfy standards like *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."), and *Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"), the Court will have to determine what the OSH Act and related regulations actually require. The questions raised by Counts One through Three are thus already before this Court. It makes no sense to say a court could decide these issues for purposes of the APA claim but could not decide them as standalone claims.

*Second*, as for the collateral question, it overlaps with the previous inquiry. *See Axon*, 143 S. Ct. at 904. Defendants' entire argument here is that Plaintiffs "would make the very same claims

that they have brought here" if the Secretary were to withdraw approval of the State Plan. ECF No. 12, at 24–25. But that same thing was true of the petitioners in *Free Enterprise*. They would have also raised their "collateral" argument as a defense had they proceeded as the federal government contended they had to. Thus, Defendants' argument must fail. As for the Supreme Court's recent discussion of this factor, Plaintiffs' claims do not "address the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Axon*, 143 S. Ct. at 904. The claims here are about the scope of Defendants' power, not any procedural or evidentiary matters that come up in a typical proceeding.

*Third*, it is not "hard to imagine more suitable subjects" for agency expertise. ECF No. 12, at 25. In fact, it's easy. There's the permissible exposure limits for hazardous chemicals. There's the type of safety gear that must be worn in dangerous professions. Or there's how to safely use ladders or respirators. These are policy decisions on which Defendants should be experts.

Here, however, the case involves the legal interpretation of statutes and regulations. As Justice Brennan once modestly put it, "the federal courts have acquired a considerable expertness in the interpretation and application of federal law." *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 827 (1986) (Brennan, J., dissenting). Judges, far more than bureaucrats, know how to apply the tools of statutory construction and discern the meaning of legal text. Although Defendants may operate under the OSH Act and its regulations regularly, there is no special skill that Defendants to have to determine what those texts mean. *Cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). To say that agencies have some special expertise in interpreting the law to which courts must defer is a doctrine of judicial abdication. *Cf. Waterkeeper All. v. Env't Prot. Agency*, 853 F.3d 527, 539 (D.C. Cir. 2017) (Brown, J., concurring) ("An Article III renaissance

is emerging against the judicial abdication performed in *Chevron*'s name. If a court could purport

fealty to *Chevron* while subjugating statutory clarity to agency 'reasonableness,' textualism will

be trivialized. 'For whatever the *agency* may be doing under *Chevron*, the problem remains that

*courts* are not fulfilling their duty to interpret the law.'" (quoting *Gutierrez-Brizuela v. Lynch*, 834

F.3d 1142, 1152–53 (10th Cir. 2016) (Gorsuch, J., concurring)).

> **B.     The claims for declaratory relief about the OSH Act and regulations are actionable under the APA.**

Defendants note that the Declaratory Judgment Act does not create a cause of action but is

remedial only. *See* ECF No. 12, at 26. And so that's true. *See, e.g.*, *CGM, LLC v. BellSouth

Telecommunications, Inc.*, 664 F.3d 46, 55 (4th Cir. 2011).

But these claims are not brought solely under the Declaratory Judgment Act. The APA

gives Plaintiffs a cause of action on Counts One, Two, and Three. The APA requires a court to

"hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

That "not in accordance with law" language gives courts the authority to decide whether an

agency's interpretation of a statute or regulation is correct. *See, e.g.*, *Perez v. Cuccinelli*, 949 F.3d

865, 872 (4th Cir. 2020).

The 2016 Interim Final Rule declares that state plans must "increase their penalties to

reflect the federal penalty increases at the state levels in order to maintain this 'at least as effective'

status," 81 Fed. Reg. at 43,446, and mandates that "State Plans will also be required to increase

their penalties regularly in the future to maintain at least as effective penalty levels," *id.* at 43,447.

As support for these purported mandates, Defendants cited (without any discussion) 29 U.S.C.

§ 667(c)(2), 29 C.F.R. § 1902.4(c)(2)(xi), and 29 C.F.R. § 1902.37(b)(12). *See id.* at 43,446.

Plaintiffs have the right under § 706(2)(A) to challenge Defendants' interpretation of these

provisions as not in accordance with law.

To the extent the Complaint does not make that clear, either the Court can construe the Complaint as Plaintiffs have explained it here as a plausible claim, or the Court grant permit Plaintiffs to amend the complaint.

### C.    Plaintiffs had good reason to assert Count Seven.

Defendants jump to insist the Court dismiss Count Seven as duplicative of *McMaster I*. *See* ECF No. 12, at 14. As is clear from the Complaint, this claim is a short one, and it was included in the Complaint to ensure that, if Plaintiffs did prevail on their other claims, there was no doubt that any subsequent adjustment that wasn't part of any other claim could be used as a basis to force the State Plan to increase its civil penalties. If Defendants will concede that, if they lose on any of their other claims, the State Plan will not be required to increase its civil penalties under any of the annual adjustments that followed the 2016 Interim Final Rule, then there is no need for Count VII. Protection from any such demand by Defendants could instead be folded into the injunctive relief that Plaintiffs receive.

<u>**CONCLUSION**</u>

Defendants' Motion to Dismiss should be denied.

Respectfully submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Senior Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov

*Counsel for Governor McMaster*

s/Robert E. Horner
Robert E. Horner (Fed Bar No. 7872)
S.C. Dep't of Labor, Licensing & Regulation
P.O. Box 11329
Columbia, South Carolina 29211
803-896-4199
bob.horner@llr.sc.gov

*Counsel for S.C. Dep't of Labor, Licensing & Regulation*

June 5, 2023
Columbia, South Carolina