## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | |
|---|---|
| HENRY MCMASTER, in his official capacity as Governor of the State of South Carolina, and SOUTH CAROLINA DEPARTMENT OF LABOR, LICENSING & REGULATION,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, in her official capacity as Acting Secretary of Labor; OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION; and DOUGLAS PARKER, in his official capacity as Assistant Secretary for Occupational Safety and Health,<br><br>*Defendants.* | Civil Action No.: 3:23-cv-1038-SAL<br><br>**Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss** |

Plaintiffs respectfully submit this Response in Opposition to Defendants' Motion to Dismiss (ECF No. 35).

## <u>INTRODUCTION</u>

When Congress enacted the Occupational Safety and Health Act of 1970, Pub. L. 91-596, 84 Stat. 1590 (Dec. 29, 1970) ("OSH Act") to promote safe and healthy workplaces, Congress gave States the option to create their own plan for achieving these goals. South Carolina did just that, and the State has run its State Plan successfully for half a century.

Then, in a 2016 Interim Final Rule that increased federal civil penalties, Defendants declared that state plans *must* increase their civil penalties to match the federal ones. *See* Department of Labor Federal Civil Penalties Inflation Adjustment Act Catch-Up Adjustments, 81 Fed. Reg. 43,430, 43,436–37 (July 1, 2016) ("2016 Interim Final Rule"). For years after that, however, Defendants took no steps to enforce this mandate. That changed in 2022 when

Defendants suddenly elevated the civil-penalty issue, making it a finding in the FAME Report for South Carolina's State Plan for the first time and attempting to revoke Arizona's state plan based, in part, on the penalty issue. Defendants' actions compelled Plaintiffs to bring this lawsuit to prevent Defendants from penalizing South Carolina and revoking the State Plan for refusing to comply with an unlawful decree, as it was doing with the Arizona state plan.

Rather than address the merits of Plaintiffs' claims, Defendants offer up various jurisdictional and procedural arguments, none of which has merit. The claims here are timely, as the six-year limitations period on which Defendants rely was tolled, either by the previous lawsuit that Plaintiffs filed or by Defendants' own delay in trying to enforce their mandate. Plaintiffs' claims are, moreover, within this Court's jurisdiction. *Thunder Basin* does not apply in a situation like this, in which the only way a party can obtain judicial review is "to bet the farm," "incur a sanction," and face "severe punishment should its challenge fail." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010). Defendants' other arguments are similarly flawed, so their Motion to Dismiss should be denied.

## **BACKGROUND**

### A.    **OSHA and state plans**

The OSH Act took effect in 1971, *see* § 34, 84 Stat. at 1620, and it required the Secretary of Labor to promulgate standards for safety and health in workplaces based on national-consensus or established-federal standards, *see* 29 U.S.C. § 655(a); *see also id.* § 652 (defining terms). To implement this congressional directive, the Secretary created OSHA, and to promote compliance with the promulgated standards, the OSH Act established federal civil (as well as criminal) penalties for violations. *See id.* § 666.

As an alternative to having employers in a State governed directly by OSHA and these

federal regulations, Congress gave States the option to create state plans. *See id.* § 667(b). The Secretary must approve a state plan if it meets certain criteria. The important criterion here is the requirement to provide "for the development and enforcement of safety and health standards relating to one or more safety or health issues, which standards (and *the enforcement of which standards*) are or will be *at least as effective* in providing safe and healthful employment and places of employment as the standards promulgated" by OSHA. *Id.* § 667(c)(2) (emphasis added); *see also* 29 C.F.R. § 29.1902.1 *et seq.* (providing criteria and procedure for approval of state plans). If the Secretary finds that, after approval, the administration of a state plan fails "to comply substantially with any provision" of that plan, then the Secretary may withdraw his approval of the plan. 29 U.S.C. § 667(f).

The Secretary gave South Carolina initial approval to operate the State Plan in 1972, *see* South Carolina Developmental Plan, 37 Fed. Reg. 25,932 (Dec. 6, 1972), before certifying the State Plan four years later, *see* South Carolina; Certification of Completion of Developmental Steps, 41 Fed. Reg. 32,424 (Aug. 3, 1976). South Carolina received final approval of the State Plan in 1987. *See* South Carolina State Plan; Final Approval Determination, 52 Fed. Reg. 48,103 (Dec. 18, 1987). South Carolina has successfully administered and effectively enforced the State Plan for more than five decades. Compl. ¶ 39, ECF No. 1.

**B.      Federal civil penalties for violations of workplace safety and health standards**

The OSH Act established the original maximum amounts of federal civil penalties for violations. *See* OSH Act, § 17, 84 Stat. at 1606–07. For example, willful or repeated violations of federal standards could result in a fine of up to $10,000 per violation. *Id.* § 17(a), 84 Stat. at 1606. Serious violations subjected parties to penalties of up to $1,000 per violation. *Id.* § 17(b), 84 Stat. at 1606. Failing to meet OSHA's requirement to post certain information for employees about

workplace safety and health also carried a penalty of up to $1,000. *Id.* § 17(i), 84 Stat. at 1607.

Two decades later, Congress amended the federal penalty amounts in the Omnibus Reconciliation Act of 1990, Pub. L. 101-508, 104 Stat. 1388 (Jan. 23, 1990). Congress changed the $10,000 cap on federal penalties for willful or repeated violations to $70,000 and the cap on other penalties (such as for serious violations and failure to post information) to $7,000. *See id.* Title III, § 3101, 104 Stat. at 1388-29. These federal penalty provisions remain codified in the United States Code today. *See* 29 U.S.C. § 666.

Soon after, to account for inflation, Congress enacted the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990) ("1990 Federal Penalties Act"). The 1990 Federal Penalties Act required most federal agencies to adjust their civil penalties every five years to account for any intervening inflation. *See id.* § 4, 104 Stat. at 891. But OSHA was one of a few agencies that Congress later exempted from this requirement. *See* Debt Collection Improvement Act of 1996, § 31001(s)(1), Pub. L. 104-134, 110 Stat. 1321-358, 1321-373 (Apr. 26, 1996).

OSHA lost this exemption in the Bipartisan Budget Act of 2015, which included the Federal Civil Penalties Inflation Adjustment Act of 2015, Pub. L. 114-74, Title VII, 129 Stat. 584, 599 (Nov. 2, 2015) ("2015 Federal Penalties Act"). The 2015 Federal Penalties Act shortened the timeline for inflation adjustments from five years to one. *Id.* § 701(b)(1)(A), 129 Stat. at 599 (amending 28 U.S.C. § 2461 note). It also required agencies to make a one-time adjustment to the federal civil penalties "through an interim final rulemaking" process.[1] *Id.* § 701(b)(1)(D), 129 Stat.

---

[1] Unlike most rules, which are proposed, commented upon, revised, and only then published by a federal agency as a final rule, an interim final rule becomes effective immediately upon publication, without any prior comment period. Interim final rules are typically issued under one of § 553(b)'s exceptions for publishing proposed rules, *see* 5 U.S.C. § 553(b), or (as in this case) pursuant to a specific congressional directive.

at 599 (amending 28 U.S.C. § 2461 note). After that, the 2015 Federal Penalties Act requires OSHA to make annual adjustments to these federal penalties for inflation, and it exempts these adjustments from § 553's notice-and-comment requirements. *Id.* § 701(b)(1)(D), 129 Stat. at 599 (amending 28 U.S.C. § 2461 note).

Consistent with the 2015 Federal Penalties Act, OSHA issued inflation adjustments for federal civil penalties for every year since 2016. *See* Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2023, 88 Fed. Reg. 2210 (Jan. 13, 2023) ("2023 Adjustment"); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2022, 87 Fed. Reg. 2328 (Jan. 14, 2022); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2021, 86 Fed. Reg. 2964 (Jan. 14, 2021); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2020, 85 Fed. Reg. 2292 (Jan. 15, 2020); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2019, 84 Fed. Reg. 213 (Jan. 23, 2019); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2018, 83 Fed. Reg. 7 (Jan. 2, 2018); Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2017, 82 Fed. Reg. 5373 (Jan. 18, 2017) ("2017 Adjustment"); 2016 Interim Final Rule, 81 Fed. Reg. 43,430.

### C.    State civil penalties for violations of workplace safety and health standards

Since the Secretary of Labor approved the State Plan, South Carolina law has included civil (and criminal) penalties for violations of state health and safety standards. At first, the maximum civil penalties were $1,000 and $500. *See* 1971 S.C. Acts No. 379, § 13 (codified at S.C. Code § 40-273 (1962)). The South Carolina General Assembly increased those statutory caps to $10,000

and $1,000, depending on the type of violation.[2] *See* 1973 S.C. Acts No. 311, § 1. The General Assembly again increased South Carolina's caps on statutory civil penalties to $70,000 and $7,000 following the congressional increase of federal penalties in 1990. *See* 1991 S.C. Acts No. 25 (codified at S.C. Code Ann. § 41-15-320).

South Carolina's penalties have remained unchanged since 1991, matching the levels in the U.S. Code. *See* 29 U.S.C. § 666.

### D.    Defendants demand increases to state civil penalties

In the 2016 Interim Final Rule, OSHA stated that state plans must "increase their penalties to reflect the federal penalty increases at the state levels in order to maintain this 'at least as effective' status." 81 Fed. Reg. at 43,446. OSHA further declared that "State Plans will also be required to increase their penalties regularly in the future to maintain at least as effective penalty levels." *Id.* at 43,447. The 2016 Interim Final Rule did not discuss how the text of the OSH Act requires or even permits matching penalties, and the only rationale Defendants offered in the 2016 Interim Final Rule for the increased penalties was a "deterrence principle[]" that "rational actors are *less likely* to commit violations when faced with higher penalties." *Id.* at 43,445. In this Interim Final Rule, Defendants also amended § 1902.4(c)(2)(xi) so that it required state plans to have "effective sanctions" not only "such as those set forth in the Act" but also "such as those set forth . . . 29 CFR 1903.15(d)." 29 C.F.R. § 1902.4(c)(2)(xi).

OSHA attempted to justify its position in the 2017 Adjustment. As for penalties having to match, in the 2017 Adjustment, OSHA insisted that its "long-standing position" is "that 'at least

---

[2] Earlier here, Defendants have insisted that this change to the state penalties indicates that the OSH Act does require state penalties to match federal ones. *E.g.*, ECF No. 17, at 7. Defendants are wrong. But a full explanation of why gets to the merits and is not directly responsive to Defendants' Motion to Dismiss.

as effective,' in this context, means that State Plans must have maximum and minimum penalty levels that are at least as high as OSHA's maximum and minimum penalty levels." 2017 Adjustment, 82 Fed. Reg. at 5375; *see also id.* at 5376 ("historically, State Plans have matched OHSA's maximum and minimum penalties identically"). As for the insertion of 29 C.F.R. § 1903.15(d) into § 1902.4(c)(2)(xi), the 2017 Adjustment characterized this change as merely a "technical amendment" or "pointer" that OSHA had "the inherent authority" to make. *Id.* at 5376.

In the subsequent annual adjustments, OSHA invoked 29 U.S.C. § 667(c)(2), 29 C.F.R. § 1902.4(c)(2)(xi), and 29 C.F.R. § 1902.37(b)(12) as the bases for requiring state plans to make annual adjustments to their civil penalties. *See, e.g.*, 2023 Adjustment, 88 Fed. Reg. at 2213.

At no point during the five-plus years since the 2016 Interim Final Rule became effective did Defendants take any steps to enforce this mandate on the State Plan. Only after the current Administration took office in 2021 did that change, when OSHA issued its FY 2021 Federal Annual Monitoring Evaluation Report for South Carolina ("2021 FAME Report"), which asserts that state plans "were required to adopt the initial maximum penalty level increase and the subsequent annual increases." 2021 FAME Report, at 18 (attached as Exhibit 1). The 2021 FAME Report includes a finding that the "State Plan has failed to adopt OSHA's initial FY 2016 maximum and minimum penalty increase and subsequent annual penalty amount increases." *Id.*

Findings in a FAME Report are significant because they are "limited to those issues that warrant corrective action by the State Plan to ensure it is [at least as effective]" as the federal standards. OSHA, *State Plan Policies and Procedures Manual* 74 (May 6, 2020), https://tinyurl.com/2p93wtfv. A finding is typically the first step OSHA takes if it intends to revoke a state plan's final approval. *See, e.g.*, Arizona State Plan for Occupational Health and Safety; Proposed Reconsideration and Revocation, 87 Fed. Reg. 23,783 (Apr. 21, 2022). A finding does

not necessarily lead to revocation proceedings. Some findings are remedied to OSHA's satisfaction. Revoking final approval would lead to concurrent jurisdiction between the State and OSHA such that OSHA could take over direct enforcement of workplace health and safety standards, displace LLR, and inject uncertainty and confusion into South Carolina's longstanding regulatory scheme, which has successfully resulted in safe and healthy workplaces in South Carolina for decades.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) should be granted only when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim, "a plaintiff must plead enough factual allegations to state a claim to relief that is plausible on its face." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). A court must accept "well-pleaded allegations" "as true and draw all reasonable factual inferences from those facts in the plaintiff's favor." *Harrell v. Freedom Mortg. Corp.*, 976 F.3d 434, 439 n.5 (4th Cir. 2020) (internal alteration omitted). "Generally speaking, a motion to dismiss is rarely appropriate in a declaratory judgment action." *New York Life Ins. v. Scott*, No. CV 2:21-01898-RMG, 2021 WL 4086483, at *2 (D.S.C. Sept. 7, 2021) (cleaned up).

## ARGUMENT

### I.    Plaintiffs' claims are timely.

Defendants insist Plaintiffs' claims related to the 2016 Interim Final Rule are untimely under 28 U.S.C. § 2401(a)'s six-year statute of limitations. *See* ECF No. 35, at 15–20.[3] For at least two reasons, Defendants are incorrect.

---

[3] Page cites are to the ECF-generated page numbers at the top of the page.

**A.    Plaintiffs could not have brought this lawsuit before Defendants took steps to enforce the mandate on state civil penalties.**

A plaintiff's claim accrues under § 2401(a) "when the plaintiff is injured by final agency action." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2448 (2024). As the Supreme Court just explained it, there are two requirements: (1) final agency action and (2) an injury. In this case, no one disputes that the 2016 Interim Final Rule is final agency action.

That leaves the injury. Defendants come at the injury question from two directions. On the one hand, they say that the injury was the promulgation of the 2016 Interim Final Rule because the State Plan existed at that time, analogizing Plaintiffs to the trade associations in *Corner Post*. *See* ECF No. 35, at 18–19. But that argument overlooks a critical distinction between *Corner Post* and this case. There, the challenged regulation about fees charged on debit-card transactions immediately went into effect in 2011, and the trade associations were negatively impacted by it then. *See NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474 (D.C. Cir. 2014) (upholding the regulation). Their suit in 2018 was therefore time barred. Here, by contrast, Defendants took no steps to enforce the 2016 Interim Final Rule upon its enactment. Despite Defendants' claim that state and federal penalties had to match, they made no effort to actually enforce that view on the State Plan between 2016 and 2022. Yes, the FAME Reports beginning in 2016 noted the state civil penalties as an issue, but only in the 2021 FAME Report (issued in August 2022) did OSHA make that issue a finding. Without Defendants taking what is typically the first step in revoking the State Plan, Plaintiffs could not point to an Article III injury to the State Plan to invoke this Court's jurisdiction. *Cf. Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012) ("when a statute has been on the books for a significant time but has not been regularly enforced, plaintiffs must usually show that something beyond the mere existence of the statute creates a credible threat of prosecution"). Before Defendants took this concrete step in the FAME Report, the Secretary

withdrawing approval of the State Plan was still very "hypothetical." ECF No. 35, at 21; *see also Murthy v. Missouri*, 144 S. Ct. 1972, 1995 (2024) ("fears of hypothetical future harm" cannot confer standing).

As part of their attempt to distinguish *Corner Post*, Defendants note that Corner Post did not exist when the regulation was enacted. *See* ECF No. 35, at 18. But that does not matter. That Corner Post didn't exist until 2018 was not the legally significant point; instead, the point was that Corner Post wasn't harmed until it came into existence and became subject to the regulation. *See Corner Post*, 144 S. Ct. at 2452–53 ("Because injury, not just finality, is required to sue under the APA, Corner Post's cause of action was not complete and present until it was injured by Regulation II."). A counterfactual proves the point: Had Corner Post existed in 2018 and only accepted cash when the regulation became effective, it would not have been harmed by that regulation until it accepted debit cards. Likewise, for the State Plan, its existence isn't what matters. Rather, what matters is when the State Plan faced harm from the 2016 Interim Final Rule.

On the other hand, Defendants seek to distinguish *Corner Post* by insisting that Plaintiffs have not faced any "regulatory enforcement" yet. ECF No. 35, at 19. This wrongly downplays the 2021 FAME Report, when OSHA escalated the civil penalties to a finding, *see* 2021 FAME Report, at 18, and the initiation of revocation proceedings against Arizona, based in part on that State not increasing its civil penalties,[4] *see* 87 Fed. Reg. at 23,786. This created a credible threat of enforcement, which constitutes an Article III injury. *See, e.g., MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("Our analysis must begin with the recognition that, where

---

[4] Defendants cannot downplay the significance of a finding in a FAME Report. OSHA made civil penalties a finding in Arizona's FAME Report shortly before starting to revoke Arizona's plan. *See* FY 2021 Federal Annual Monitoring Evaluation Report for Arizona, at A-2 (Finding FY2021-08), https://tinyurl.com/52mx4f4d.

threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced."). This lawsuit was filed within § 2401(a)'s six-year window from when this threat of enforcement finally arose, so this case is timely.

### B.    The limitations period should be tolled.

Even if the statute of limitations somehow began to run in 2016, this case is still timely. What Defendants overlook is that § 2401(a)'s time limit is a claim-processing rule subject to equitable tolling, *see, e.g.*, *DeSuze v. Ammon*, 990 F.3d 264, 272 (2d Cir. 2021); *Jackson v. Modly*, 949 F.3d 763, 778 (D.C. Cir. 2020); *Clymore v. United States*, 217 F.3d 370, 374 (5th Cir. 2000),[5] and that there are at least two reasons for this Court to toll it here.

*First*, equitable tolling is permitted when a plaintiff "has actively pursued his judicial remedies by filing a defective pleading during the statutory period." *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990). Defendants insist that *McMaster I* did not toll the limitations period because Plaintiffs challenged the 2022 Adjustment, rather than the 2016 Interim Final Rule. *See* ECF No. 35, at 17–18 & n.15. This argument, however, ignores the fact that Plaintiffs explicitly and repeatedly said they were challenging the "mandate" on the State Plan, not the mathematical calculation of the increase in the penalties. Dec. 2, 2023 Hr'g Tr., *McMaster I*, at 13; *see also, e.g.*, *id.* at 4 ("This case is, at its core, a challenge to how the federal government has gone about trying to force state OSHA plans to raise their civil penalties."); *id.* at 5 (argument focusing on the "mandate" language of the 2022 Adjustment); *id.* at 6–7 (discussing the 2016 Interim Final Rule); *id.* at 19–21 (discussing the meaning of "at least as effective as"); *id.* at 66 (arguing the effect of

---

[5] The Fourth Circuit has not yet ruled on this question, but most caselaw establishes that this limitations period can be equitably tolled.

"the underlying statute and regulation"). In fact, Plaintiffs even stated that challenging Defendants' interpretation of the OSH Act was "the alternative" if Plaintiffs couldn't challenge the 2022 Adjustment and that Plaintiffs were "happy to challenge" the 2016 Interim Final Rule if that was "where [the Court] conclude[s]" Plaintiffs' claims needed to lie. *Id.* at 13–14; *see also id.* at 71 (offering to challenge any regulations and statutes to assert these claims). If these arguments at the hearing weren't enough, the opening paragraph of the complaint in *McMaster I* stated that Plaintiffs brought the "action to challenge the requirement that the South Carolina State Plan increase its civil penalties to match the increased federal civil penalties." *McMaster I*, ECF No. 1, at 1. Plus, the briefing in that case confirmed that Plaintiffs' focus was the purported obligation that the State Plan increase its civil penalties to match the federal ones.[6] *See, e.g.*, *McMaster I*, ECF No. 8, at 15–18; *McMaster I*, ECF No. 22, at 8–13.

Plaintiffs thought challenging the 2022 Adjustment "was sufficient" to obtain relief. *Burnett v. New York Cent. R. Co.*, 380 U.S. 424, 429 (1965). As it turned out, this Court concluded that the 2022 Adjustment was not actually the mandate on the State Plan. Instead, this Court explained, the mandate was the 2016 Interim Final Rule. That's why *McMaster I* was dismissed. But that dismissal does not change Defendants' "aware[ness]" that Plaintiffs were "actively pursuing" their challenge to the mandate on state civil penalties. *Id.* at 430.

---

[6] Given all these statements, Defendants can gain no traction from Plaintiffs' insistence at the *McMaster I* hearing that Plaintiffs were correct to challenge the 2022 Adjustment. *See* ECF No. 35, at 17 n.15. In the midst of litigation, a party is expected to advocate for its position. That's what Plaintiffs did. But in doing so, Plaintiffs never wavered from their core focus: the federal mandate on the State Plan to increase state civil penalties. Plaintiffs' aim was not lost on this Court in *McMaster I*. The Court recognized that Plaintiffs had not challenged the "actual adjustment—the math." *McMaster I*, ECF No. 34, at 8. Rather, Plaintiffs "challenge[d] the 'mandate' that state plans are required to increase their penalties in alignment with OSHA's penalty increases to maintain at least as effective penalty levels." *Id.* (internal alteration and quotation mark omitted). Plaintiffs should not be retroactively penalized for attempting to take a targeted focus, rather than the too-common shotgun approach.

This case therefore represents a textbook example of equitable tolling: Plaintiffs "pursued [their] judicial remedies" before the limitations period ran, by Defendants' own calculation, on January 18, 2023. *Irwin*, 498 U.S. at 96; *Burnett*, 380 U.S. at 429–30; *see* ECF No. 35, at 4, 16. In no way has Plaintiffs "failed to exercise due diligence." *Irwin*, 498 U.S. at 96. Instead, Plaintiffs simply challenged the wrong promulgation from Defendants, mistakenly (it turned out) assigning too much weight to Defendants' own assertion that the 2022 Adjustment was a "final rule," 87 Fed. at Reg. 2328, that could thus be challenged in court. A mere 12 days after this Court held that it lacked jurisdiction to rule on Plaintiffs' challenge to the 2022 Adjustment, Plaintiffs filed their Complaint here.[7] With the benefit of tolling from August 8, 2022, when *McMaster I* was filed, to March 2, 2023, when *McMaster I* was dismissed, Plaintiffs' claims here are timely.

Defendants cannot avoid this conclusion by treating the 2016 Interim Final Rule and the 2022 Adjustment as "entirely separate conduct." ECF No. 17, at 9. The 2022 Adjustment was promulgated only because of the "mandate" that Plaintiffs sought to challenge. *McMaster I*, ECF No. 34, at 8. As Defendants themselves put it, the 2015 Federal Penalties Act "required each agency to make a one-time 'catch up adjustment' by July 1, 2016, and then to publish annual adjustments thereafter." ECF No. 35, at 12. The 2022 Adjustment and the 2016 Interim Final Rule are thus intimately intertwined. The only reason that Plaintiffs did not challenge the 2016 Interim Final Rule in *McMaster I* was because they treated the 2022 Adjustment as including the mandate, so challenging the 2016 Interim Final Rule would have been redundant.

---

[7] Ultimately, Plaintiffs' goal is to ensure the Court can fulfill the Fourth Circuit's "strong preference that . . . claims and defenses be disposed of on their merits." *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010). To that end, as an alternative to this new lawsuit, Plaintiffs are renewing their Rule 60(b) motion to reopen *McMaster I* for leave to amend the complaint and assert their claims there, with a few differences that are described in that motion.

*Second*, equitable tolling is allowed when "the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass."[8] *Irwin*, 498 U.S. at 96; *see also Weick v. O'Keefe*, 26 F.3d 467, 470 (4th Cir. 1994) (equitable tolling permitted when a plaintiff is "lulled . . . into inaction" by the defendant's misconduct). Defendants are quick to point out that several States commented on the 2016 Interim Final Rule being arbitrary and capricious and that OSHA raised the State Plan's civil penalties as "new issues" in FAME Reports from 2016 through 2020. *See* ECF No. 35, at 16–17. To be sure, those things are true, but Defendants took no action after responding to the comments that would have put the State Plan on notice, and "issues" are not "findings," which triggered the revocation of Arizona's state plan.

What Defendants omit is that they did *nothing* to even suggest they planned to enforce this mandate on any state plan until the 2021 FAME Report. Years of inaction led Plaintiffs (and other States) to believe that Defendants were not actually going to enforce the mandate in the 2016 Interim Final Rule and their interpretation of the OSH Act and regulations. Even if Defendants were not trying to "trick[]" Plaintiffs, ECF No. 17, at 11, their inaction gave the distinct impression to many States that failing to increase state civil penalties would not be an issue that would or could threaten the State Plan's viability.

Only in the months and days before *McMaster I* did Defendants give any indication to the

---

[8] In an earlier filing, Defendants called this argument "particularly audacious," in light of their invitation to amend the complaint at the December 2022 hearing in *McMaster I*. ECF No. 17, at 10 n.2. For at least two reasons, this argument is not nearly as bold as Defendants suggest. In the first place, focusing on the December 2022 hearing ignores years of Defendants' inaction on the 2016 Interim Final Rule. To be clear, Plaintiffs' argument is not intended to suggest that Defendants' counsel has employed a strategic sleight of hand in this litigation; rather, Plaintiffs' argument is directed at Defendants' years of hypnotizing inaction, which naturally (if not intentionally) lulled Plaintiffs' into believing that initiating litigation would be premature. And in the second, it's not as if Plaintiffs' original theory was so obviously wrong that they should have jumped at Defendants' invitation. This Court held a 90-minute hearing and issued a ten-page order addressing whether Plaintiffs could challenge the 2022 Adjustment.

contrary. Defendants made the civil penalties a finding in a FAME Report for the first time in Fiscal Year 2021, which was issued on August 4, 2022 (just four days before Plaintiffs filed *McMaster I*). *See* Farr Decl. ¶ 13, *McMaster I*, ECF No. 8-1, at 4. Even outside of South Carolina, Defendants only began to act on state civil penalties earlier in 2022, when OSHA sought to begin revoking Arizona's state plan for, among other things, not increasing its civil penalties to match the federal ones. *See* 87 Fed. Reg. at 23,786. Within four days after South Carolina learned that Defendants would try, for the first time, to enforce their unlawful demand that state civil penalties match federal penalties, Plaintiffs challenged Defendants' authority to impose such a requirement.

Consider what not equitably tolling the limitations period here would do. Without tolling, any state entity or official (or, for that matter, any private plaintiff) would feel the need to rush to the courthouse every time the federal government promulgated a new rule that might —if only years later—be interpreted or applied in a way with which the potential plaintiff disagrees. Tolling the limitations period allows the facts to develop, which either crystalizes the dispute or makes litigation unnecessary. On the other hand, not tolling the limitations period disincentives federal-state cooperation, incentives shotgun legal challenges rather than rifle-shot approaches, and invites ripeness defenses to quickly brought claims.

                    *        *        *

Bolstering Plaintiffs' tolling argument are the purposes of statutes of limitations. One, a limitations period "establishes a deadline after which the defendant may legitimately have peace of mind." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751 (1980). Defendants here knew that Plaintiffs challenged the mandate on state civil penalties within § 2401(a)'s six-year window. Two, a limitations period ensures evidence is available and protects "against stale demands." *Bell v. Morrison*, 26 U.S. (1 Pet.) 351, 360 (1828). Given the statutory-interpretation focus of this case,

there are no concerns about lost evidence. And three, a limitations period encourages plaintiffs to sue promptly by "stimulat[ing] . . . activity and punish[ing] negligence." *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 139 (1879). Plaintiffs acted promptly here, bringing their first case within days of the state civil penalties being made a finding in the FAME Report.

## II.    Plaintiffs' claims are within this Court's jurisdiction.

### A.    *Thunder Basin* does not apply here.

Defendants insist that because South Carolina has a "judicial backstop" in place, Plaintiffs' claims for declaratory relief fall outside of this Court's jurisdiction under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). ECF No. 35, at 22. Defendants, however, miss the fact that this so-called backstop demands exactly what the Supreme Court "normally do[es] not require" of a plaintiff: "to bet the farm by taking the violative action before testing the validity of the law." *Free Enter. Fund*, 561 U.S. at 490 (cleaned up). Under Defendants' view here, only by jeopardizing the State Plan can South Carolina challenge Defendants' interpretation of the OSH Act and the regulations.

#### 1.    Congress did not intend to deprive this Court of jurisdiction here.

The *Thunder Basin* doctrine recognizes that Congress may implicitly deprive district courts of jurisdiction over certain claims. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). The first step in determining whether Congress has done so is to ask whether it is "fairly discernible in the statutory scheme" that Congress intended to "allocate[] initial review to an administrative body." *Thunder Basin*, 510 U.S. at 207. Although Congress may have explicitly discussed district court jurisdiction in other contexts of the OSH Act, Congress did not exclude all claims about state plans from a district court's jurisdiction in § 667(g). That section is narrow and applies only when the Secretary "withdraw[s] approval or reject[s]" a state plan, at which point a

State may seek review from the circuit court. 29 U.S.C. § 667(g); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240–41 (1989) ("as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute").

Comparing the OSH Act to other statutes confirms that § 667(g) does not reveal or express any congressional intent to allocate all claims to an administrative body. Consider the Mine Act in *Thunder Basin*. There, the Supreme Court pointed to 30 U.S.C. § 815 ("procedure for enforcement"), § 823(d) ("proceedings before administrative law judge; administrative review"), and § 830(i) ("authority [of commission] to assess civil penalties"). 510 U.S. at 207–08. The Mine Act had a "detailed structure" for agency review. *Id.* at 207. Likewise, in *Elgin v. Department of Treasury*, the Court pointed to 5 U.S.C. § 7511 ("definitions"), § 7512 ("actions covered"), § 7513 ("cause and procedure"), § 7701 ("appellate procedures"), and § 7703 ("judicial review of decisions of the Merit Systems Protection Board") to describe the "elaborate framework" that Congress established for the claims at issue there. 567 U.S. 1, 11 (2012) (internal quotation mark omitted).

Here, by contrast, Defendants can point to only two short, adjacent subsections. *See* ECF No. 35, at 22 (citing 29 U.S.C. §§ 667(f), (g)). But notably, those provisions are limited to the Secretary's authority to review and withdraw approval of state plans. They say nothing about being unable to challenge OSHA regulations in district court.

Nor does § 660(c)(2) help Defendants. *See id.* at 23. That provision speaks only to the Secretary's authority to bring an action in district court if an employee's rights under the OSH Act are violated. It says nothing about legal challenges to OSHA regulations.

### 2.    Claims like Plaintiffs' are not ones within any removal of jurisdiction.

Even if Defendants could demonstrate that § 667(f) and § 667(g) are part of a statutory scheme to take claims away from district courts, Defendants have not (and cannot) establish that claims like the ones here are ones that Congress intended to be within this statutory structure. *See Axon Enter.*, 598 U.S. at 186. This second step of *Thunder Basin* involves a three-part inquiry: One, "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim?" *Id.* (cleaned up). Two, "is the claim wholly collateral to the statute's review provisions?" *Id.* (cleaned up). And three, "is the claim outside the agency's expertise?" *Id.* (cleaned up).

*First*, the fact that review before a court of appeals "can" provide meaningful review is clear. *Id.* at 190. This factor looks at whether meaningful review can happen in the court of appeals for the specific claim that a plaintiff brings. *See id.* at 191. Plaintiffs aren't claiming, for instance, that Defendants would be forcing the State Plan to adopt health or safety standards that are unnecessary or duplicative. Plaintiffs aren't claiming that Defendants are misinterpreting data about the effects of the State Plan on workers. Rather, Plaintiffs are claiming that Defendants are suddenly trying to force the State Plan to do something that federal law does not authorize Defendants to force the State Plan to do.

This distinction between types of claims is clear from the text of § 667(g). That provision permits a court of appeals to modify or set aside the Secretary's decision only if the decision "is not supported by substantial evidence." 29 U.S.C. § 667(g). "Substantial evidence" is, as its name suggests, an evidentiary-related framework that "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (case involving 42 U.S.C. § 405(g) and the standard for judicial review of findings by the Social Security commissioner). Questions of law involving the scope of agency authority—

like the ones Plaintiffs raise here—have nothing to do with factual findings or whether there is substantial evidence in any record. Nor do they relate to legal conclusions based on factual findings.

Clarifying the nature of Plaintiffs' claim also disposes of Defendants' suggestion that § 667(f) and § 667(g), when read together, preclude judicial review here. *See* ECF No. 35, at 24. This isn't some attempt to demand pre-enforcement review of a decision that rightly belongs to the Secretary under § 667(f) and for which a state plan is afforded meaningful review under § 667(g). Additionally, Defendants' argument here undercuts their suggestion that Plaintiffs have already "bet the farm" because the State Plan has not, as of today, ceased to be in effect.

Defendants' eagerness to try to muster a defense to the "bet the farm" disclaimer from *Free Enterprise Fund* overlooks a basic fact: Plaintiffs do not want to lose the State Plan. The State Plan has worked well for half a century. Nor do Plaintiffs want to *have* to litigate the claims they assert here. Yet bringing this case is the only way that Plaintiffs can get any resolution to their dispute with Defendants regarding whether the OSH Act permits and the regulations require state civil penalties to match (or exceed) federal ones without risking the State Plan.

That said, Defendants still miss the mark on their "bet the farm" argument, and *Free Enterprise Fund* confirms as much. *See* ECF No. 35, at 24–27. The harm that petitioners in that case faced was a sanction from the Public Company Accounting Oversight Board, which could have followed a critical report and formal investigation that the Board had issued and launched. 561 U.S. at 486–87. The federal government argued that the petitioners could raise their claim "by appealing a Board sanction." *Id.* at 490. That, of course, the Court explained, would have required petitioners to "incur a sanction," then, if the Securities and Exchange Commission affirmed, petitioners would have "w[o]n access to a court of appeals—and severe punishment should its

19

challenge fail." *Id.* (emphasis omitted). This scenario was the "bet the farm" risk that the Court "d[id] not require" from plaintiffs and did "not consider . . . a 'meaningful' avenue of relief." *Id.* at 490–91.

Plaintiffs face that precise scenario here, under Defendants' reading of the OSH Act. According to Defendants, Plaintiffs must refuse to capitulate to Defendants' demand to increase the state civil penalties, let the Secretary withdraw approval of the State Plan that has been in place for decades (thereby incurring the sanction), and only then seek judicial review in the Fourth Circuit, at which point Plaintiffs risk the severe punishment of losing the State Plan if their challenge fails. True, "bet the farm" may have been coined when discussing a criminal case, *see MedImmune*, 549 U.S. at 129, but that term is not limited to such cases, *see, e.g.*, *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 427 (5th Cir. 2024) (challenge to regulation under the Horseracing Integrity and Safety Act); *Consumers' Rsch. v. Fed. Commc'ns Comm'n*, 67 F.4th 773, 786 (6th Cir. 2023) (challenge to FCC regulations on universal service fund).

As for "irremediable harm," *Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 631 (4th Cir. 2018), Defendants downplay the disruption that revoking the State Plan could cause, *see* ECF No. 35, at 25–26. Even if the Secretary's decision could be ultimately "set aside," 29 U.S.C. § 667(g), the disruption and confusion in the interim to businesses that have been subject to the State Plan for decades is real. The State Plan has been the sole source of health and safety regulations in South Carolina since it received final approval 35 years ago. Revoking final approval would inject uncertainty and potentially chaos into the state regulatory scheme, upend LLR's processes (not to mention the confusion on regulated businesses), and potentially displace state employees. This disruption would not be undone even by an appellate court's order setting aside the Secretary's withdrawal of approval.

20

Defendants are incorrect that the State Plan has already bet the farm. *See* ECF No. 35, at 26–27. To be sure, the General Assembly has not increased the statutory civil penalties yet, but for years, Defendants did nothing about that. Only now, in the 2021 FAME Report, have Defendants taken the first step to bring this issue to a head by making the civil penalties a "finding" in that report. Again, findings are "limited to those issues that warrant corrective action by the State Plan to ensure it is [at least as effective]" as the federal standards, OSHA, *State Plan Policies and Procedures Manual* 74, and they are the first step OSHA typically takes if it intends to revoke a state plan's final approval. Only now does the State Plan face the choice of whether to increase civil penalties and resolve the finding or to stand firm in Plaintiffs' position that such a demand of the State Plan is unlawful and await revocation proceedings.

*Second*, as for the collateral question, it overlaps with the previous inquiry. *See Axon*, 598 U.S. at 192. Defendants' entire argument here is that Plaintiffs "would make the very same claims that they have brought here" if the Secretary were to withdraw approval of the State Plan. ECF No. 35, at 28. But that same thing was true of the petitioners in *Free Enterprise*. They would have also raised their "collateral" argument as a defense had they proceeded as the federal government contended they had to. Thus, Defendants' argument must fail. As for the Supreme Court's recent discussion of this factor, Plaintiffs' claims do not "address the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Axon*, 598 U.S. at 193. The claims here are about the scope of Defendants' power to impose certain mandates on state plans generally, not any procedural or evidentiary matters that come up in a typical proceeding or about whether the Secretary had substantial evidence to support her decision about a particular state plan.

*Third*, it is not "hard to imagine more suitable subjects" for agency expertise. ECF No. 35, at 28. In fact, it's easy. There's the permissible exposure limits for hazardous chemicals. There's

the type of safety gear that must be worn in dangerous professions. Or there's how to safely use ladders or respirators. These are policy decisions on which Defendants should be experts. Defendants are even experts on whether state plans comply with requirements of the OSH Act. As with chemicals, safety gear, and ladders, that's a factual decision.

But this case involves the legal interpretation of statutes and regulations. As Justice Brennan once modestly put it, "the federal courts have acquired a considerable expertness in the interpretation and application of federal law." *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 827 (1986) (Brennan, J., dissenting). Judges, far more than bureaucrats, know how to apply the tools of statutory construction and discern the meaning of legal text. Although Defendants may operate under the OSH Act and its regulations regularly, there is no special skill that Defendants have for determining what those texts mean. *Cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). To say that agencies have some special expertise in interpreting the law to which courts must defer is a doctrine of judicial abdication. *Cf. Waterkeeper All. v. Env't Prot. Agency*, 853 F.3d 527, 539 (D.C. Cir. 2017) (Brown, J., concurring) ("An Article III renaissance is emerging against the judicial abdication performed in *Chevron*'s name."). That was the reason the Supreme Court overruled *Chevron* a few months ago, and now "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

**B.    The claims for declaratory relief about the OSH Act and regulations are actionable under the APA.**

Defendants note that the Declaratory Judgment Act does not create a cause of action but is remedial only. *See* ECF No. 35, at 29. And so that's true. *See, e.g.*, *CGM, LLC v. BellSouth Telecommunications, Inc.*, 664 F.3d 46, 55 (4th Cir. 2011).

But these claims are not brought solely under the Declaratory Judgment Act. The APA gives Plaintiffs a cause of action on Counts One, Two, and Three. The 2016 Interim Final Rule (and thus every subsequent annual adjustment) is based on Defendants' interpretation of 29 U.S.C. § 667(c)(2), 29 C.F.R. § 1902.4(c)(2)(xi), and 29 C.F.R. § 1902.37(b)(12). *See* 81 Fed. Reg. at 43,438–39. The APA leaves it to "the reviewing court" to "decide all relevant questions of law" and to "interpret . . . statutory provisions," 5 U.S.C. § 706, and that court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," *id.* § 706(2)(A). If Defendants' interpretation of the statute and the regulations is incorrect, the cornerstone for the mandate on state civil penalties is removed, and the demand that state plans increase their penalties to match the federal ones comes tumbling down. It's Defendants' interpretation of these statutes that has to be evaluated to determine whether the 2016 Interim Final Rule is "in accordance with law." In evaluating whether that rule can be upheld under § 706(2)(A), the Court may—and necessarily has to—decide the meaning of § 667(c)(2), § 1902.4(c)(2)(xi), and § 1902.37(b)(12).

The 2016 Interim Final Rule declares that state plans must "increase their penalties to reflect the federal penalty increases at the state levels in order to maintain this 'at least as effective' status," 81 Fed. Reg. at 43,446, and mandates that "State Plans will also be required to increase their penalties regularly in the future to maintain at least as effective penalty levels," *id.* at 43,447. As support for these purported mandates, Defendants cited (without any discussion) 29 U.S.C. § 667(c)(2), 29 C.F.R. § 1902.4(c)(2)(xi), and 29 C.F.R. § 1902.37(b)(12). *See id.* at 43,446. Plaintiffs have the right under § 706(2)(A) to challenge Defendants' interpretation of these provisions as not in accordance with law.

Even if the Complaint does not make that clear, either the Court can construe the Complaint

23

as Plaintiffs have explained it here as a plausible claim, or the Court can permit Plaintiffs to amend the complaint to mirror these claims in the proposed amended complaint in *McMaster I*, which expressly references the APA in these Counts.

**C.    Plaintiffs had good reason to assert Count Seven.**

Defendants insist the Court dismiss Count Seven as duplicative of *McMaster I*. *See* ECF No. 35, at 15. As is clear from the Complaint, this claim is a short one, and it was included in the Complaint to ensure that, if Plaintiffs did prevail on their other claims, there was no doubt that any subsequent adjustment could be a basis to force the State Plan to increase its civil penalties. Defendants previously refused to concede that if they lose on any of their other claims, the State Plan need not increase its civil penalties under any of the annual adjustments that followed the 2016 Interim Final Rule. *See* ECF No. 17, at 21. But assuming Defendants could not use these adjustments if Plaintiffs prevailed on their challenge to the 2016 Interim Final Rule, then Count VII is unnecessary.

<div align="center">

**CONCLUSION**

</div>

Defendants' Motion to Dismiss should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Senior Litigation Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov

*Counsel for Governor McMaster*

</div>

<u>s/Robert E. Horner</u>
Robert E. Horner (Fed Bar No. 7872)
S.C. Dep't of Labor, Licensing & Regulation
P.O. Box 11329
Columbia, South Carolina 29211
803-896-4199
bob.horner@llr.sc.gov

*Counsel for S.C. Dep't of Labor, Licensing & Regulation*

September 20, 2024
Columbia, South Carolina